UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SHENA CARPENTER | * | CIVIL ACTION NO. 21-328 |
| | * | |
| VERSUS | * | SECTION: "R"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER | * | JUDGE SARAH S. VANCE |
| OF THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

REPORT AND RECOMMENDATION

The plaintiff, Shena Carpenter, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 21) be GRANTED; the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 22) be DENIED; and that this matter be remanded to the Commissioner for further proceedings in accordance with this Recommendation.

**Procedural Background**

Shena Carpenter applied for SSI on June 21, 2019,[1] asserting a disability onset date of March 15, 1999. She alleged the following illnesses, injuries, or conditions:  epilepsy and cervical fusion.  On September 30, 2019, her claim was denied by the state agency. The Disability Determination Explanations concluded that "[t]he medical evidence shows that even though you may experience some discomfort, you are able to walk, stand and move about independently. You

---

[1] She retained counsel on the same date.

1

are able to grasp, hold and carry objects that are not too heavy. The evidence shows that your epilepsy is best controlled when following doctors prescribed medical treatment." R. at 73.

Ms. Carpenter requested reconsideration. Her claim was independently reviewed by a physician and disability examiner at the State agency, who considered additional medical records received in December 2019 and January 2020. On January 21, 2020, the Social Security Administration ("SSA") notified Ms. Carpenter of its finding that the previous determination denying her claim was proper under the law.

Ms. Carpenter requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 17, 2020, with Ms. Carpenter and her counsel present. On September 24, 2020, the ALJ issued an adverse decision. Ms. Carpenter timely appealed to the Appeals Council, which denied review on December 11, 2020.

On February 14, 2021, Ms. Carpenter filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs 14, 15). The parties filed cross-motions for summary judgment. (Rec. Docs. 21, 22). Ms. Carpenter is represented by counsel.

## Evidence in the Record

*Hearing Testimony*

Ms. Carpenter believes she is disabled and unable to work because of her seizures. R. at 47. She explained that she gets a seizure when she gets too excited, too nervous, or too sad. R. at 48. She testified that she has at least three seizures per month, sometimes more than one in a day. R. at 52. Ms. Carpenter was seeing a doctor and taking medication for her seizures. R. at 47. She admitted that the medication helps. R. at 48.

She also has a Chiari malformation, which causes pain in her head. R. at 48. Ms. Carpenter gets headaches at least three times a week. R. at 53. She described the pain as really, really sharp. Id.  The headaches can last all day. R. at 54.

Ms. Carpenter had two heart surgeries and had a pacemaker implanted when she was 12 years old. R. at 49. She has had neck surgery and was prescribed a neck brace afterwards. R. at 50. As of the hearing she only wore the neck brace every month or two. Id.

As to her functional capacity, Ms. Carpenter testified that she can lift 40 pounds, that she can walk about 50 feet before needing to stop, that she can sit for only five minutes before needing to stand, and that she can stand for about 30-45 minutes before needing to sit again. R. at 51.  On a typical day she prepares breakfast for her daughters, tries to do a little bit of housework, and then prepares dinner. Id. Ms. Carpenter uses marijuana every now and then and smokes a pack of cigarettes a day. R. at 51-52.

With regard to her education, Ms. Carpenter completed the seventh grade. R. at 46. She does not have a GED, and she testified that she does not know how to read very well and that she has a difficult time with math. Id.

The ALJ asked the vocational expert to consider a hypothetical individual that is classified as "younger" under the Act, has a seventh grade education, no GED, has indicated problems with reading and math, and has no past relevant work. R. at 57. For the first hypothetical, the ALJ asked the vocational expert to assume that the person can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, she can stand and/or walk for a total of six hours in an eight-hour day and sit for six hours in an eight-hour day; she should never climb ladders, ropes, or scaffolds; she can only occasionally stoop, kneel, crouch, and crawl; and she must avoid unprotected heights, hazardous machinery, open bodies of water, and open flames R. at 56. The

vocational expert testified that work with these limitations would be classified as light. Id. She further testified that there would be work in the national economy that such an individual could perform, including general officer clerk, DOT 239.567-010, unskilled with an SVP of 2, light, and approximately 226,000 jobs available on the national level; sorter, DOT 521.687-086, unskilled with an SVP of 2, light, and approximately 127,000 jobs available on the national level; and hand packer, DOT 753.687-010, unskilled with an SVP of 2, light, and approximately 315,000 jobs available on the national level. R. at 57-58.

For the second hypothetical, the ALJ asked the vocational expert to assume that the person can occasionally lift and carry 10 pounds; frequently lift and carry 10 pounds;[2] sit for six hours out of an eight-hour workday; stand and walk for two hours out of an eight-hour workday; occasionally climb ramps; rarely climb stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, or crawl. R. at 58. The person is right-hand dominant and able to reach overhead frequently with the upper extremities bilaterally. Id. The person must avoid concentrated exposure to temperature extremes, dust, fumes, gases, odors, other pollutants, and poor ventilation; must avoid unprotected heights, hazardous machinery, open bodies of water, and open flames; must avoid work outdoors in the sunlight; and driving must not be required. Id. The work must be unskilled with oral instructions that can be learned in 30 days or less; should not require use of an adding machine or calculator; and should not require more than one to three steps. R. at 59. The vocational expert testified that there would be work available in the national economy that this individual could perform and she offered the following sampling: general office clerk, DOT 209.587-010, unskilled with SVP of 2, sedentary, with approximately 97,000 jobs available at the

---

[2] It is unclear whether the ALJ intended to include the limitation of both "occasionally" and "frequently" carrying 10 pounds, but the vocational expert responded to the hypothetical as presented by the ALJ and the ALJ ultimately included both the occasionally and frequently limitation in Ms. Carpenter's residual functional capacity.

national level; assembler, DOT 734.687-018, unskilled with SVP of 2, sedentary, with approximately 28,000 jobs available at the national level; and sorter, DOT 521.687-086, unskilled with SVP of 2, sedentary, with 13,000 jobs available at the national level. R. at 59.

Ms. Carpenter's counsel then asked the vocational expert whether either of the hypothetical individuals would be considered a competitive employee if they had six to nine seizures on the job per year, which would involve convulsing and needing a coworker to assist to protect their safety. R. at 60. The vocational expert testified that such a person would not be a competitive employee. Id. Ms. Carpenter's counsel did not ask the vocational expert any other questions. The vocational expert also testified that her responses had been in accordance with the DOT or based on her opinion or other administratively acceptable materials. Id.

*Claimant's Submissions*

Ms. Carpenter filled out a Function Report form as part of her application process. R. at 185. She reported that she is limited in her ability to work because she has no control over when seizures happen so she cannot drive, cannot be exposed to flashing lights, and cannot have stress or excitement. Id. She reported problems with understanding, memory, and concentration. R. at 190.

She reported that her daily activities include cleaning house and taking care of her two daughters. R. at 186. She can make sandwiches and do light cooking daily. R. at 187. She does cleaning and laundry daily. Id. She does not have assistance. R. at 186. She reported that she could walk two miles before needing to take a rest. R. at 190.

Ms. Carpenter reported that she goes outside every day, but she cannot go out alone because she fears she may have a seizure. R. at 188. She goes food shopping once or twice a week. R. at 188. She is able to pay bills and count change. Id. She visits with friends two to three times a

month. R. at 189. She does not have problems getting along with family, friends, or others, and gets along well with authority figures. R. at 190-91.

Ms. Carpenter also completed a Seizure Questionnaire. R. at 194. She reported having seizures at least twice a month, though she could not remember the approximate dates of her seizures other than her most recent seizure on August 2, 2019. Id.  She reported that her seizures occur both day and night and typically last 30 minutes to an hour. She feels horrible afterwards and is not able to resume normal activity until the next day. Id.  She reported needing to visit the emergency room for seizures in December 2018. Id.  She also reported that her seizures are triggered by excitement, stress, flashing lights, tiredness, and sometimes by nothing at all. Id.  She regularly takes medication for her seizures and never runs out of medication. R. at 195.

Janet Claire Damare, the great grandmother of Ms. Carpenter's daughters, completed a seizure witness questionnaire. R. at 198. She reported that the last seizure she saw was in December 2018.[3] Id.  She described the seizures and reported that it takes Ms. Carpenter 24 hours to regain her strength. Id.  She noted that she is usually called to come get Ms. Carpenter's children while she sleeps after a seizure. R. at 199.

Ms. Carpenter completed a second seizure questionnaire, apparently after requesting reconsideration of the state agency decision denying her claim for benefits in September 2019. R. at 212-14. The information provided is the same as on the previous seizure form, except that she reported her last seizure was December 2, 2019, and she listed two other seizures having occurred on November 28, 2019, and October 21, 2019. R. at 212. Around that time she also completed a second Function Report form. R. at 215. The information provided was similar to that provided on

---

[3] In response to the question, "How many times have you seen this individual have a seizure?" Ms. Demare's response of December 18 has the entire word December and part of the 1 in 18 scratched out. R. at 198.  However, it is unclear whether this indicates that she has observed 18 seizures, or she was stating that she observed the December 2018 seizure(s) Ms. Carpenter identified as having sent her to the emergency room.

the previous form, except that instead of 2 miles, she reported that she could walk 1-2 miles before needing to rest. R. at 220.

The record also contains a copy of a piece of paper with a handwritten list of dates at R. at 258. It appears that this may be the seizure log referenced in Ms. Carpenter's counsel's letter of August 11, 2020—six days prior to the hearing before the ALJ. R. at 259. This letter reports that counsel had learned that day that Ms. Carpenter has kept a seizure log, that counsel had requested copies, and that counsel anticipated receiving them by August 12, 2020. Id. Counsel requested that the log be admitted as evidence at the hearing. Id. The list includes 3 to 4 dates per month from September 2019 through July 2020.[4] R. at 258.

*Medical Records*

The record reflects Ms. Carpenter's treatment at the Tulane Medical Center, the Lakeview Regional Medical Center, and Covington Cardiovascular Care. Because this appeal does not concern Ms. Carpenter's heart condition, headaches related to her Chiari malformation, or her neck pain, this summary focuses on Ms. Carpenter's treatment for seizures.

Ms. Carpenter presented at the Tulane Medical Center on October 26, 2017, and treated with Dr. John Freiberg, Jr. R. at 274. She reported multiple seizures the day before. Id. Her prescription for Keppra had been increased, and Dr. Freiberg noted that Ms. Carpenter continued to have seizures but with improved pattern. Id. She did not complain of any side effects. Id. She was noted to be very adherent. Id.

She returned to Dr. Freiberg on January 16, 2018. R. at 276. She reported that she had three seizures since her last appointment, which was an improvement. Id. She reported Keppra was making her tired. Id. She followed up with Dr. Freiberg on April 27, 2018, and again on August

---

[4] The list itself does not indicate who prepared it or what it purports to be. Id.

2, 2018. R. at 281, 285. At the August appointment, Dr. Freiberg referenced Ms. Carpenter's seizure log, which noted two seizures in April, three in May, and two in July. R. at 281.

She followed up with Dr. Freiberg on December 21, 2018. R. at 286. He noted she was adherent to medications and experiencing one seizure a month. Id. Later that day,[5] Ms. Carpenter presented to the emergency room with reports of a seizure. R. at 264. She was treated for her seizures and observed. R. at 268.

Dr. Freiberg referred Ms. Carpenter to Dr. Thomas Francavilla at Tulane Lakeview Regional Medical Center for a possible Chiari malformation. R. at 479. She presented there on January 15, 2019, with a chief complaint of headaches. R. at 479. Several CT scans were performed and findings consistent with Chiari malformation as well as cervical disc displacement at C5-C6 were observed. R. at 292-96; 400-01. An anterior cervical diskectomy, allograft fusion, and anterior instrumentation of C5-C6 was performed by Dr. Francavilla on February 18, 2019. R. at 403. By April 2019, it was noted that her headaches had improved. R. at 469.

Ms. Carpenter followed up with Dr. Freiberg on July 9, 2019, for her seizure disorder. R. at 467. She reported intermittent seizures and being very adherent to her medications. Id. It was noted that her seizure disorder was fairly controlled. Id.

She returned to Dr. Freiberg on October 22, 2019, and reported her head and neck pain had returned. R. at 465. She reported several seizures over the past few months and that she had been adherent to her medications. Id. Dr. Freiberg noted her seizures were suboptimally controlled. Id.

While in the lobby for a CT scan of her head on December 18, 2019, Ms. Carpenter experienced a seizure. R. at 360. She remained post ictal for over an hour and was admitted for neuro consultation. Id. The emergency room notes indicate that she was post-ictal upon arrival,

---

[5] The records indicate that her appointment with Dr. Freiberg was around 9:30 a.m., R. at 287, while the "initial greet time" at the emergency department was noted to be at almost 5:00 p.m. R. at 264.

moaning and writhing in the bed. R. at 365. She reported she had had a seizure at home that morning. Id.  She reported having frequent seizures and being compliant with her medication, including having taken it that morning. Id. ; R. at 373. She had not had any recent medication/dietary changes or travel, sick contacts, or illness. R. at 373-74. She reported she was typically active and independent with activities of daily living and ambulation at home. R. at 374. Her lab results show she was positive for THC and tricyclic antidepressants. R. at 361. The lab results also showed she had a Levetiracetam level less than 2, with a note that "[t]he appropriate reference ranges for Levetiracetam have not been established however the proposed ranges for seizure control are from 6 to 46 micrograms/mL." R. at 390. It was noted that her seizure was likely secondary to nontherapeutic levels. R. at 420. Risk of noncompliance with medications was discussed. Id.  Levetiracetam labs run on December 26, 2019, show a level of 78.2 R. at 359.

Ms. Carpenter followed up with Dr. Freiberg on January 29, 2020. R. at 459. Her prescription for levetiracetam was reduced, oxcarbazepine was increased, amitriptyline HCl was stopped, and she was started on mirtazapine. R. at 459.

Ms. Carpenter called to check on her follow up appointment on March 31, 2020, but was informed that Dr. Freiberg could not see her. R. at 462. During the phone call, she was offered a tele-visit with Dr. Longo two to three times, but declined, stating that she wanted to follow up with Dr. Freiberg because he was aware of the pain in her head. Id.

### Decision of the Administrative Law Judge

The ALJ determined that Ms. Carpenter has not engaged in substantial gainful activity since the date of her application on June 21, 2019. The ALJ determined that Ms. Carpenter has the following severe impairments: epilepsy and spine disorder; status post cardiac condition with failure and pacemaker placement; THC use (substance use disorder) (DAA); headaches (without

aura and secondary), Chiari malformation; and Wolf Parkinson White (WPW) Syndrome. But the ALJ also found that Ms. Carpenter does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ considered the entire record and found that Ms. Carpenter had the residual functional capacity to perform sedentary work with the following additional limitations: she is able to lift and carry 10 pounds frequently and 10 pounds occasionally; sit for six hours out of an eight-hour workday; stand and walk for two hours out of an eight-hour workday; occasionally climb ramps, only rarely climb stairs, and never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. Further, she is right had dominant, with the upper extremities bilaterally frequently able to reach overhead. She must avoid concentrated exposure to temperature extremes such as extreme heat and extreme cold; avoid concentrated exposure to dust, fumes, gases, odors, other pollutants, and poor ventilation; and avoid unprotected heights, hazardous machinery, open bodies of water, and open flames. Her job should not require driving as a requirement and should avoid work outdoors in the sunlight. The work should be unskilled work with oral instructions that can be learned in 30 days or less. The job should not require the use of an adding machine or calculator. Nor should the job require more than 1-3 steps. The ALJ noted this was not due to a mental impairment but because of Ms. Carpenter's seventh grade education, no general equivalency diploma, and reported problems with reading and math. The remaining limitations were due to her pacemaker, neck surgery, and seizures.

The ALJ found Ms. Carpenter had no past relevant work, and therefore transferability of job skills was not an issue. On the date of application, she was 33 years old, which is defined as a "younger individual." She has limited education. The ALJ considered Ms. Carpenter's age,

education, and residual functional capacity and determined that significant numbers of jobs exist in the national economy that she can perform. In coming to this conclusion, the ALJ relied on the vocational expert's testimony that a person with Ms. Carpenter's age, education, and assigned residual functional capacity could perform work as a general office clerk, DOT 209.587-010, with 97,000 jobs in the national economy and a sorter, DOT 521.687-086, with 13,000 jobs available in the national economy. The ALJ did not consider the third job suggested by the vocational expert, finding that it did not fit with the parameters of the residual functional capacity assessed. The ALJ then concluded that Ms. Carpenter has not been under a disability as defined in the Act since June 21, 2019, the date her application was filed.

## Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ erred in determining Ms. Carpenter's residual functional capacity without further limitations related to her seizures.

Issue No. 2.    Whether the ALJ erred in finding that Ms. Carpenter can perform other work that exists in significant numbers in the national economy when, according to Ms. Carpenter, the jobs proposed by the vocational expert are obsolete and no longer exist in the national economy and/or because the number of jobs available fall short of a "significant number."

## Analysis

### I.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v.

Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the

claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.    **Plaintiff's Appeal**.

*Issue No. 1.    Whether the ALJ erred in determining Ms. Carpenter's residual functional capacity without further limitations related to her seizures.*

Ms. Carpenter argues that the residual functional capacity determined by the ALJ is not supported by substantial evidence because the ALJ failed to include any limitation for her seizure disorder. Specifically, she submits that the evidence shows that she has at least three seizures per month (sometimes more than one per day) and at least one seizure day per month. She submits that the evidence also shows that it takes her a full day to recover from the exhaustion and weakness that results from a seizure. She points out that the vocational expert testified that if an individual experiences a seizure at work six to nine times per year, the individual would not be employable. Yet, with treatment, she says she suffers at least twelve seizures in a year (that is, at least one per month). She argues that had the ALJ considered her seizures in formulating the residual functional capacity, the ALJ could not have determined that Ms. Carpenter was capable of performing work. She argues that this legal error requires that the decision be vacated and the matter remanded for a new decision.

The Commissioner counters that numerous limitations in the residual functional capacity assessment address Ms. Carpenter's seizure disorder. These include no climbing of ladders, ropes, or scaffolds and no unprotected heights, machinery, open bodies of water, open flames, or driving. The Commissioner submits that such limitations have been described as "usual seizure precautions." E.g., Petticrew v. Colvin, No. 4:13-CV-2119, 2014 WL 2880019, at *9 (S.D. Tex. June 23, 2014) (noting that the ALJ had found that the claimant "must take the usual seizure precautions of avoiding unprotected heights or climbing ladders, ropes, and scaffolds" and must also "avoid moving or dangerous equipment and open flames ... [as well as] commercial driving" (quoting the ALJ's opinion)); Carnley v. Colvin, No. 3:12-CV-3535-N BF, 2013 WL 5300674, at *8 (N.D. Tex. Sept. 20, 2013) (noting that the vocational expert had testified that "when you talk about seizure precautions from a vocational standpoint you want to avoid working around open flames, moving machinery, uneven surfaces, heights or, you know, dangerous work environments" (quoting the record)); Vasquez v. Astrue, No. 3:10-CV-1072-BH, 2010 WL 5464870, at *6 (N.D. Tex. Dec. 30, 2010) ("[T]he ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels but with standard seizure precautions, i.e. no working at unprotected heights; no working in inherently hazardous situations such as chemical vats, open fire pits, hot grills, stove tops, and waterways; and no driving.").

The Commissioner argues that Ms. Carpenter has not identified what additional limitations the ALJ should have included. The Commissioner adds that the ALJ noted that Ms. Carpenter experienced flares of increased seizure activity when she failed to comply with the medication regimen or during periods of substance abuse. The Commissioner points out that in December 2018 while adherent to her medications, Ms. Carpenter was only experiencing one seizure per month. The Commissioner adds that after a seizure in December 2019, laboratory testing revealed

sub-therapeutic levels of anti-convulsant medications and positive urine drug screen for cannabis—Ms. Carpenter was counseled regarding the risks of noncompliance with her anti-seizure medication regimen. Further, the Commissioner submits that there are no medical opinions in the record indicating that Ms. Carpenter was disabled or had limitations greater than those assessed by the ALJ.

The court finds that while the ALJ properly included seizure precautions in the residual functional capacity, the ALJ failed to address the myriad evidence that Ms. Carpenter suffers at least one seizure per month and that it takes her an extended period of up to a day to recover from such seizures. Ms. Carpenter testified that she has three seizures per month. R. at 52. She completed a seizure questionnaire for the state agency and reported two seizures per month. R. at 194. She also reported that she could not resume normal activity until the next day. R. at 194. Her children's great-grandmother completed a form explaining that it takes Ms. Carpenter 24 hours to recover from a seizure and that she comes to pick up and care for the children when Ms. Carpenter needs to sleep after a seizure. R. at 198-99. The log submitted to the ALJ before the hearing appears to report three to four seizures per month from September 2019 through July 2020. These reports of duration of her symptoms are supported by the physician's notes that when Ms. Carpenter suffered a seizure in the waiting room for another appointment, she was still post ictal and confused an hour later. R. at 160. Her reports to medical providers are consistent with her social security application materials. In January 2018, Dr. Freiberg noted that Ms. Carpenter had three seizures since her last appointment in October 2017 and that this was an improvement. R. at 276. This indicates monthly seizures. In August 2018, Dr. Freiberg's notes reference Ms. Carpenter's seizure log, which showed two seizures in April, three in May, and two in July. R. at 281. He noted that she was adherent to medications. Id. In December 2018, Dr. Freiberg's notes state that Ms.

Carpenter was adherent to medications and was suffering one seizure per month. R. at 286. In October 2019, Dr. Freiberg's notes reflect that she had several seizures over the past few months and had been very adherent to her medications. R. at 467.

The ALJ summarized some, though not all, of this evidence. The ALJ did not specifically address the frequency of Ms. Carpenter's seizures or how seizures during the workday and/or recovery from seizures would impact her ability to work. Instead, the ALJ concluded that Ms. Carpenter experienced flares in seizure activity when she was non-compliant. This appears to be based on the December 2019 emergency room lab results indicating sub-therapeutic levels of her anti-seizure medication. R. at 390, 420. But there is no other instance of such noncompliance in the record. To the contrary, Ms. Carpenter consistently reported to her treating physician Dr. Freiberg that she was consistent with her medication even as she was experiencing one or more seizures a month. Indeed, when Ms. Carpenter followed up with Dr. Freiberg in January 2020 after the December 2019 emergency room visit, he reduced her prescription for Levetiracetam and his notes do not indicate that she was counsel for medication compliance. There is simply no evidence in the record to suggest that Dr. Freiberg believed medication noncompliance could be the reason why she continued to have seizures once a month. While the record shows one possible instance of noncompliance, the ALJ's description of "*period*s of poor to non-compliance" is not supported by the record. There are no other lab results reflecting her medication levels. Similarly, the only instance in the record of drug use is the December 2019 lab test results indicating the presence of THC. This single record hardly amounts to evidence that she experienced increased seizure activity during "*period*s of substance abuse." In fact, the records indicate that she was not even counseled about the effect—if any—of THC use on her seizure disorder or to stop using marijuana, which she reported using occasionally.

16

At one seizure a month, Ms. Carpenter suffers twelve seizures per year. Based on the vocational expert's testimony, it seems that twelve seizures per year could be inconsistent with an ability to maintain a job. To be precise, the vocational expert testified that a person suffering six to nine seizures on the job per year could not maintain competitive employment. Would six to nine of Ms. Carpenter's twelve seizures occur during the workday or at times that affect her ability to work? To the extent this is knowable, the record offers no clarity and the ALJ shared no analysis. There are approximately 250 work-days in a year (excluding weekends and public federal holidays). That is about 68% of the year. If 68% percent of her seizures occurred on workdays, she may have suffered eight seizures on the job.  There may be other ways to analyze the evidence of the frequency of Ms. Carpenter's seizures and their impact on her ability to work, but the ALJ provided no insight in this regard.

Ms. Carpenter's residual functional capacity as assessed by the ALJ does not reflect any time off work or interrupted workdays as a result of her seizures and post ictal recovery. To the extent the ALJ implicitly concluded that the frequency of Ms. Carpenter's seizures does not preclude her ability to engage in competitive work, the court cannot find substantial evidence to support this conclusion. Accordingly, the court finds that the ALJ's residual functional capacity assessment for Ms. Carpenter is not supported by substantial evidence and the matter must be remanded.

*Issue No. 2.*    *Whether the ALJ erred in finding that Ms. Carpenter can perform other work that exists in significant numbers in the national economy when, according to Ms. Carpenter, the jobs proposed by the vocational expert are obsolete and no longer exist in the national economy and/or because the number of jobs available fall short of a "significant number."*

Plaintiff argues that the two jobs that the ALJ concluded Ms. Carpenter could perform no longer exist in the national economy. The first, described by the vocational expert as "general

office clerk," but actually described as "addresser" by the Dictionary of Occupational Titles ("DOT") involves addressing by hand items for mailing. Plaintiff argues that courts across the country have held that this job is obsolete. She argues that courts have rejected as unreasonable vocational experts' testimony that significant number of such jobs exist in the national economy. She adds that the SSA's publication, Occupational and Medical-Vocational Claims Review Study completed in May 2011 affirms that this job does not currently exist in significant numbers.

As to the second job, described as "sorter" by the vocational expert, but described as "nut sorter" in the DOT, plaintiff argues that it, too, has been found obsolete. Even if the nut sorter job was not obsolete, plaintiff argues that the vocational expert's unreliable testimony about the other position diminishes the reliability of the entirety of her testimony. She further argues that the vocational expert's testimony that 13,000 jobs exist in the national economy falls short of the amount required to find a "significant number" of jobs available. The plaintiff insists that she should have been found disabled at Step 5 because the ALJ did not find any other work she could perform. She submits that this case should be remanded for a calculation of benefits.

The Commissioner argues that the ALJ properly relied on the ALJ's testimony. She submits that the vocational expert's description of the jobs as "general office clerk" and "sorter" is different from the DOT descriptions of "addresser" and "nut sorter." She says this suggests that the vocational expert was relying on different, updated versions of the jobs and that she was referencing the broader general categories of general office clerk and sorter.

The Commissioner argues that even if the general office clerk is equivalent to the addresser job, the ALJ still met her burden at step five with the sorter job. She points out that plaintiff has cited no cases from this district holding the nut sorter job obsolete. Further, she argues that there

is no defined threshold for what amounts to a significant number of jobs. She cites cases holding that less than 13,000 jobs can qualify as significant.

Moreover, the Commissioner argues that Ms. Carpenter's counsel did not cross-examine the vocational expert at the hearing. She argues this precludes her from objecting to the step five analysis. She also notes that Ms. Carpenter did not object to the vocational expert's qualifications.

The Social Security regulations provide that when determining that sedentary jobs exist in the national economy, the Commissioner takes "administrative notice of reliable job information from various governmental and other publications," including Department of Labor's DOT and Occupational Analyses prepared for the SSA by various State employment agencies. 22 C.F.R. § 404.1566(d); id. § 416.966(d). As other courts have observed, the DOT was last updated in 1991. Jennings v. Berryhill, No. 17-CV-3062-LTS, 2018 WL 3656306, at *11 n. 5 (N.D. Iowa Aug. 2, 2018). In Cunningham v. Astrue, an unpublished decision out of the Sixth Circuit Court of Appeals, the court remarked that "common sense dictates that when [DOT] descriptions appear obsolete, a more recent source of information should be consulted." Cunningham v. Astrue, 360 F. App'x 606, 615 (6th Cir. 2010); see Hardine v. Comm'r of Soc. Sec., No. 4:19-CV-147-DAS, 2021 WL 1098483, at *1 (N.D. Miss. Feb. 26, 2021) ("Why the vocational experts continue to rely on this particular [obsolete] job rather than so many others provided in the enormous DOT is a puzzle, but the court will not accept it any more than it would accept the job of lamplighter."). And, in fact, the Department of Labor has replaced the DOT with the Occupational Information Network (O*Net), "a database that is continually updated based on data collection efforts that began in 2001." Id. at 616; see Vocational Evidence—Use of Dictionary of Occupational Titles and O*NET, 3 Soc. Sec. Law & Prac. § 43:4 (Mar. 2022). The jobs at issue in Cunningham were "security camera monitor" and "document preparer." 360 F. App'x at 614. The court of appeals

reviewed the DOT descriptions for these jobs and determined that because the same job descriptions were not found on O*Net, "the VE's dependence on the DOT listings alone does not warrant a presumption of reliability." Id. at 616. The court remanded to the Commissioner for consideration of whether the DOT job descriptions for document preparer and security camera monitor were reliable in light of the economy at the time of the hearing before the ALJ. Id.

With regard to the job identified by the vocational expert here as "general office clerk," both parties readily concede that the DOT number supplied by the expert provides for a job with the following title: "ADDRESSER (clerical) alternate titles: addressing clerk; envelope addresser." I U.S. Dep't of Labor, Dictionary of Occupational Titles 180 (4th ed. 1991). As the vocational expert testified, this job is sedentary and has an SVP of 2. Id. The DOT job description provides "Addresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail." Id. Numerous district courts across the United States have found the "addresser" job to be obsolete. Yanke v. Kijakazi, No. 20-CV-1055, 2021 WL 4441188, at *4 (E.D. Wis. Sept. 28, 2021); ); N.B. v. Saul, No. 20-CV-01138-LB, 2021 WL 1947526, at *11 (N.D. Cal. May 14, 2021); Jason Robert F. v. Comm'r, Soc. Sec. Admin., No. 3:20-CV-00201-BR, 2021 WL 1010946, at *8 (D. Or. Mar. 16, 2021); Hardine, 2021 WL 1098483, at *1. It is worth noting that a slide deck that appears to have been created for the SSA includes the job of "addresser" in a list of jobs that "might be obsolete." Mark Trapani & Deborah Harkin, Occupational and Medical-Vocational Claims Review Study 7 (May 2011), available at https://www-origin.ssa.gov/oidap/Documents/PRESENTATION--TRAPANI%20AND%20HARKIN--OIDAP%2005-04-11.pdf (last accessed June 17, 2022). The study notes that "[i]t is doubtful that these jobs, as described in the DOT, currently exist in significant numbers in our economy." Id. Further, the O*Net has no "addresser" job. The court has

located a job described as "Mail Clerks and Mail Machine Operators, Except Postal Service," with the following summary of the work "Prepare incoming and outgoing mail for distribution. Time-stamp, open, read, sort, and route incoming mail; and address, seal, stamp, fold, stuff, and affix postage to outgoing mail or packages. Duties may also include keeping necessary records and completed forms." O*Net Online, Mail Clerks and Mail Machine Operators, Except Postal Service, https://www.onetonline.org/link/summary/43-9051.00 (last visited June 17, 2022). This work seems similar to the "addresser" description, however, such jobs have an SVP range of 4 to 6 and usually require a high school diploma—characteristics that appear to be inconsistent with Ms. Carpenter's education and experience and that differ from the vocational expert's testimony about the job. Id.

The Commissioner's opposition to Ms. Carpenter's argument is half-hearted. She does not argue that the job of "addresser" remains relevant in the present economy. Instead, she suggests that the vocational expert was referring to a job other than the one for which she provided a DOT number. If that is so, there is no way to conclude from the record what job the vocational expert intended to reference. She did not describe the job duties. To the extent she might have been referring to the job described on O*Net as "Mail Clerks and Machine Operators," the SVP range is different from that she testified to. The court agrees with others that have considered the issue that the job of "addresser" as defined by the DOT is obsolete. Under the circumstances, the court cannot find that the vocational expert's testimony regarding the job of "general office clerk" with DOT reference number 209.587-010 supports finding the existence of a substantial number of jobs in the national economy.

The court next turns to the job described by the vocational expert as "sorter" with a DOT number that corresponds to the job "NUT SORTER (can. & preserv.) alternate titles: hull sorter;

nut picker; nut sifter." I U.S. Dep't of Labor, Dictionary of Occupational Titles 351 (4th ed. 1991)

As the vocational expert testified, this job is sedentary and has an SVP of 2. Id. The DOT describes

the tasks of this work as follows:

> picking-belt operator Removes defective nuts and foreign matter from bulk nut meats: Observes nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks. Places defective nuts and foreign matter into containers. May be designated according to kind of nut meat sorted as Almond Sorter (can. & preserv.); Peanut Sorter (can. & preserv.).

Id. This job cannot be found on O*Net. A possibly comparable job of "Graders and sorters,

agricultural products" exists on that database, with work tasks described as "Grade, sort, or classify

unprocessed food and other agricultural products by size, weight, color, or condition." O*Net

Online, Graders and Sorters, Agricultural Products, https://www.onetonline.org/link/summary/45-

2041.00 (last visited June 17, 2022). This job has an SVP of less than 4, would require up to 3

months of preparation, and some such jobs may require a high school diploma or GED. Id. This is

not equivalent to the characteristics of nut sorter job, though it could be consistent with those

characteristics. A district court in Kentucky found the "nut sorter" job obsolete because it was not

in O*Net. See Coulter v. Colvin, No. 1:13-CV-00011-LLK, 2013 WL 3992445, at *2 (W.D. Ky.

Aug. 2, 2013); see also Abernathy v. Saul, No. 3:20CV213-GCM, 2021 WL 1734353, at *4

(W.D.N.C. May 3, 2021) (relying on Coulter and "common sense," i.e., the proliferation of

automation, to conclude that the "nut sorter" job was obsolete). The court did not consider the

possibly comparable job noted above. A district court in Washington found the vocational expert's

testimony did not support finding a significant number of "nut sorter" jobs in the national economy

based on the affidavit of plaintiff's counsel who had researched the existence of such jobs using

O*Net and information from the Bureau of Labor Statistics. Wood v. Berryhill, No. 3:17-CV-

5430-RJB-BAT, 2017 WL 6419313, at *2 (W.D. Wash. Nov. 17, 2017), report and

recommendation adopted, No. 3:17-CV-5430-RJB-BAT, 2017 WL 6372590 (W.D. Wash. Dec. 13, 2017). This case is of limited use to the court here because no such affidavit has been presented, and, moreover, it appears the attorney in that case analogized the nut sorter job to the O*Net description for "inspectors, testers, sorters, samplers, and weighers" which is described as a non-agricultural position—clearly different from the nut sorter job in the DOT. O*Net Online, Inspectors,         Testers,         Sorters,         Samplers         and         Weighers, https://www.onetonline.org/link/summary/51-9061.00 (last visited June 17, 2022).

It is unclear whether the nut sorter job still exists. This exact position cannot be found in the O*Net. A few courts have found the nut sorter job to be obsolete, noting the rise of automation and the absence of a nut sorter position in the O*Net. But there does seem to be a somewhat comparable position to nut sorter in the O*Net.

Assuming the sorter job cited by the vocational expert still exists, the plaintiff argues that the vocational expert's testimony that 13,000 such jobs exist in the national economy cannot be accepted in light of her unreliable testimony about the addresser position. Indeed, some courts in this circuit have taken that approach in similar situations. For example, in Hardy v. Commissioner of Social Security, the Northern District of Mississippi concluded:

> Given the lack of Fifth Circuit guidance on whether such a number of jobs in the national economy is sufficient and considering the questionable reliability of the VE's testimony ... the court is uncomfortable concluding and will decline to conclude that there exists a significant number of such jobs in the national economy.

No. 3:20-CV-88-DAS, 2021 WL 2695354, at *4 (N.D. Miss. June 30, 2021) (quoting Buggs v. Saul, Civil Action No. 3:20-cv-68-RP (N.D. Miss. Oct. 28, 2020).

Similarly here, not only is there a question as to the reliability of the vocational expert's testimony regarding the existence of general office clerk/addresser jobs, the nut sorter job may

also be obsolete and, moreover, 13,000 jobs may note qualify as "substantial." There is no bright

line threshold for how many jobs amount to a "substantial" number. For example, the Fifth Circuit

Court of Appeals has found 50,000 sufficient. Lirley v. Barnhart, 124 F. App'x 283, 284 (5th Cir.

2005). But 13,000 may be too few. The Commissioner cites Mercer v. Halter, where the Northern

District of Texas held that the ALJ did not err in holding that 500 jobs in Texas and 5,000 jobs in

the nation amounted to a significant number. No. CIV.A.4:00-CV-1257BE, 2001 WL 257842, at

*6 (N.D. Tex. Mar. 7, 2001). But the court in Mercer noted that the claimant had acquired special

skills that made him well-qualified for the job of aircraft log clerk. Id. No similar considerations

are at play here. The Commissioner also cites a Sixth Circuit Court of Appeals case affirming the

ALJ's finding that the claimant could perform a significant number of jobs where the vocational

expert testified to the existence of 1,350 to 1,800 such jobs in the nine-county area surrounding

the plaintiff's residence. Hall v. Bowen, 837 F.2d 272, 274-75 (6th Cir. 1988). Here, there is only

testimony regarding the existence of jobs at the national level. Although the court does not now

hold that 13,000 jobs in the national economy could never be a significant number, under the

circumstances of this case, the court cannot find that substantial evidence supports the ALJ's

determination that a substantial number of jobs exist that Ms. Carpenter could perform.[6]

Ms. Carpenter asks this court to award benefits if it finds that the ALJ did not meet her

burden at step 5. The court finds remand more appropriate under the circumstances—first, because

the court has already found remand appropriate so the Commissioner can consider the frequency

of Ms. Carpenter's seizures and the impact of such seizures on her ability to engage in competitive

---

[6] The Commissioner argues that Ms. Carpenter has waived her objections to the vocational expert's testimony because she did not raise them at the hearing. But she cites cases involving implicit conflicts between the DOT and the vocational expert's testimony. E.g., Carey v. Apfel, 230 F.3d 131, 146–47 (5th Cir. 2000). The court declines to find waiver here.

work, which will require a new step 5 analysis. And second, even if a new step 5 analysis was not required, the ALJ should consider whether the DOT listings for addresser and nut sorter are reliable and/or whether there is support for the existence of a general office clerk or sorter job in the present economy that Ms. Carpenter could perform.

## RECOMMENDATION

The court finds that substantial evidence does not support the ALJ's residual functional capacity assessment or the ALJ's step five determination that significant jobs exist in the national economy that Ms. Carpenter could perform. Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 21) be GRANTED; the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 22) be DENIED; and that this matter be remanded to the Commissioner for further proceedings in accordance with this Recommendation.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 17th day of June, 2022.

 

                         Janis van Meerveld
                  United States Magistrate Judge